Carlos Makoto Taitano, State Bar No. 275820
Taitano & Taitano LLP
P.O. Box 326204
Hagatna, Guam 96932
Telephone:    (671) 777-0581
Email:        cmakototaitano@taitano.us.com

*Attorney for Applicant*
*Jin Young Park*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of | ) |
| | ) Case Number: |
| Jin Young Park, | ) |
| | ) **DECLARATION OF KYONGSOK** |
| Applicant. | ) **CHONG IN SUPPORT OF JIN YOUNG** |
| | ) **PARK'S *EX PARTE* APPLICATION FOR** |
| | ) **ORDER PURSUANT TO 28 U.S.C. § 1782** |
| | ) **AUTHORIZING DISCOVERY FOR USE** |
| | ) **IN FOREIGN PROCEEDINGS** |
| | ) |
| | ) |
| | ) |

I, Kyongsok Chong, declare that:

1.    I am more than 21 years of age, am competent to testify on the matters stated in this declaration, and, except as may be otherwise stated in this declaration, have personal knowledge of the matters stated in this declaration.

2.    I am an attorney licensed to practice law in the Republic of Korea, and I am the Executive Partner at the LIWU Law Group in Seoul, Republic of Korea.

3.    I have reviewed the subject TikTok comments and relevant law as described in this declaration, and my opinion below is based upon those documents or facts that I have been made aware of.

4.    This declaration is in support of Jin Young Park's *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in Foreign Proceedings (hereinafter "**Application**").

*Declaration of Kyongsok Chong*

5.      I was consulted by, and advised, Jin Young Park (hereinafter "**Applicant**") about filing a civil lawsuit and obtaining evidence for his civil lawsuit against anonymous individuals (hereinafter "**Users**") who, using TikTok accounts, posted false statements that defame the Applicant through falsities.

6.      Based upon the Statement of Information of X Corp. (hereinafter "**X**") filed September 13, 2024, the mailing address of X is located at 1355 Market St., Suite 900, San Francisco, California 94103; attached as **Exhibit 1** is a true and a correct copy of the Statement of Information of X filed September 13, 2024 obtained from the California Secretary of State.

7.      According to The San Francisco Standard, X continues to maintain offices in San Jose and Palo Alto; attached as **Exhibit 2** is a true and a correct copy of the article published on The San Francisco Standard on August 5, 2024 at https://sfstandard.com/2024/08/05/x-officially-kills-its-san-francisco-headquarters-will-relocate-workers-to-south-bay/.

8.      According to TikTok's website, TikTok maintains offices in Mountain View and San Jose; attached as **Exhibit 3** is a true and a correct copy of TikTok's website at https://lifeattiktok.com/locations that shows North America locations of TikTok to include Mountain View, California and San Jose, California.

9.      According to SFGATE, TikTok has an office at 1143 Coleman Avenue in San Jose; attached as **Exhibit 4** is a true and correct copy of the SFGATE article at https://www.sfgate.com/tech/article/tiktok-office-roku-ban-bytedance-19363715.php that is reporting that TikTok subleased an office at 1143 Coleman Avenue in San Jose, California.

10.     I am the attorney of record of the Applicant for the Civil Case.

11.     Article 750 of the Civil Act of Korea provides:
**Article 750 (Definition of Torts)**
Any person who causes losses to or inflicts injuries on another person by an unlawful act, intentionally or negligently, shall be bound to make compensation for damages arising therefrom.

Minbeob [Civil Act] art. 750 (S. Kor.).

12.     Article 751 of the Civil Act of Korea provides:

**Article 751 (Compensation for Non-Economic Damages)**

*Declaration of Kyongsok Chong*

(1) A person who has injured the person, liberty or fame of another or has inflicted any mental anguish to another person shall be liable to make compensation for damages arising therefrom.

(2) The court may order the guilty party to discharge the compensation mentioned in paragraph (1) by periodical payments, and may order such guilty parties to offer reasonable security in order to insure his performance of such obligations.

Minbeob [Civil Act] art. 751 (S. Kor.).

13.    Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the elements of a tort under Article 750 are (1) an unlawful act, (2) done intentionally or negligently, (3) an injury, and (4) causation between the unlawful act and the injury.

14.    According to a decision by the Anyang Branch of the Suwon District Court that was rendered on August 27, 2021, the defendant in that case was found to have committed defamation based upon falsity by distributing an email that falsely stated that the plaintiff was a pedophile.

15.    Therefore, similar to the above case, the posts by the Users in this Case are also defamatory, because they falsely accuse the Applicant of being a pedophile.

16.    Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the Applicant has made out a prima facie case; the reply comments by the Users meet the elements of the tort of defamation under Articles 750 and 751 of the Civil Act of the Republic of Korea; and the Civil Case will withstand a motion to dismiss.

17.    The Applicant has been unable to serve the Users with legal process in the Civil Case, because the true identities of the Users are unknown.

18.    The Applicant by discovery, is seeking personal identifying information (hereinafter "**PII**") of the Users in order to identify the true identities of the Users to serve the Users with legal process.

19.    The Applicant has attempted to but has been unable to identify the true identities of the Users, and based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that there are no legal procedural means under the laws of the Republic of Korea to identify the true identities of the Users because TikTok and X, which are outside the jurisdiction of the courts of the Republic of Korea, are the only parties that have PII of the Users.

Page **3** of 4

*Declaration of Kyongsok Chong*

20.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the Applicant will not be able to proceed with the Civil Case without the true identities of the Users.

21.     TikTok and X are not, and will not be, parties or participants to the Civil Case and the information or documents sought through discovery is or are held by TikTok and X in the United States, and therefore, the information or documents sought through discovery are outside the reach of the jurisdiction of a court in the Republic of Korea.

22.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, I am not aware of any restrictions imposed by, or any policies under, the laws of the Republic of Korea limiting United States federal court judicial assistance for the purposes described herein or in the Application.

23.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, civil courts of the Republic of Korea are receptive to assistance in discovery by United States federal courts, including discovery of PII of individuals publishing anonymous online statements.

24.     The Applicant is not attempting to circumvent any foreign proof-gathering restrictions or other policies of the Republic of Korea or the United States of America.

25.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, to proceed with a civil case against a person, the person must be identified and confirmed by his or her name, address, and date of birth, with the address being of less importance as explained below.

26.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, if the Applicant can obtain the name and date of birth of the Users through discovery in this case, then the Applicant can obtain a court warrant to obtain the registered address of the Users from the local government using the name and date of birth, because every person in Korea is required to register their residential address with the local government.

27.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, with only a name and address, a court may issue a warrant for the local government to

*Declaration of Kyongsok Chong*

disclose the identity of the person; however, the local government will be unable to disclose the registered information of the person if there are multiple individuals in Korea with the same name or if the addresses were misused, incorrect, or do not exist.

28.    Based upon my experience as an attorney licensed to practice law in the Republic of Korea, if the Applicant can obtain the telephone number or bank information (bank name and account) of the Users through discovery in this case, then the Applicant can obtain a court warrant to seek the name and the date of birth of the Users from the Korean telecommunication company or bank.

29.    The discovery of the telephone number and banking information of the Users are not unduly intrusive, because this information is narrowly tailored to discover the true identities of the Users, and is not seeking irrelevant information.

30.    The reasons that the access log (dates, times, and internet protocol (hereinafter "**IP**") addresses) of the Users' TikTok accounts and X accounts (hereinafter the "**Recent Access Log**") is necessary, in addition to other PII, to identify the Users are:

(a)    When the tortfeasor, the Users in this case, accesses the internet to access the TikTok platform or the X platform, the tortfeasor's electronic device (e.g., laptop or smartphone) initially communicates with an ISP.[1] Subsequently, the ISP communicates with a company providing online services (hereinafter the "**Online Service Provider**"), in our case TikTok or X which maintains the servers upon which the TikTok accounts or X account of the Users are maintained, whereby the tortfeasor is able to access the Users' TikTok accounts or X account, respectively.

(b)    In each communication, information such as an IP address and a time stamp (the time when the specific communication occurred), may have been recorded, which records are commonly known as an "access log."

(c)    The ISP assigns an IP address to the tortfeasor when providing the tortfeasor with internet access, and therefore, the ISP is able to identify the tortfeasor

---

[1] ISP means Internet Service Provider, and is an entity that provides internet access services to users, and examples of ISPs in the United States are AT&T and Verizon.

*Declaration of Kyongsok Chong*

using the access log because it has a record of to whom it assigned a certain IP address at a certain time.

(d)    The ISP may assign a different IP address every time that a tortfeasor accesses the internet, and therefore, in order to identify a tortfeasor by using an IP address, the time and the date that the person was accessing the internet using the specific IP address is necessary.

(e)    Initially, a victim of an unlawful act on the internet, such as the Applicant, does not know the ISP of the tortfeasor, and therefore, the victim needs for the Online Service Provider to disclose the access log in its possession, and the Recent Access Log sought by the subpoena is seeking this information from TikTok and X.

(f)    By obtaining the IP address from the Online Service Provider, the victim is able to identify the ISP used by the tortfeasor, because IP addresses are owned by ISPs, and the IP addresses owned by an ISP is publicly available information.

(g)    By identifying the ISP used by the tortfeasor, the victim can provide the access log (the IP address, the port number, and the timestamp) to the ISP and request information such as the name and the address of the tortfeasor from the ISP to identify the tortfeasor in order to serve the tortfeasor with legal process.

(h)    In many cases, the Online Service Provider does not have accurate PII that is sufficient to identify the true identity of the tortfeasor because the Online Service Provider does not require the tortfeasor to record his or her true name, address, e-mail address, telephone number, or any other PII, which information must each be voluntarily provided by the tortfeasor.

(i)    Where the tortfeasor created the TikTok accounts or the X account to damage the reputation of the victim, most of the information obtained about the TikTok accounts or the X account may be fictitious because the PII is voluntary.

(j)    Therefore, in many cases, the access log obtained from the Online Service Provider is the information that will allow the victim to identify the true identity of the tortfeasor.

*Declaration of Kyongsok Chong*

(k)     Ideally, if the Online Service Provider keeps a complete access log indefinitely, a victim can more readily identify the tortfeasor.

(l)     However, in practice, a sufficient access log is not available because (i) the Online Service Provider does not record a complete access log for all communications, (ii) the Online Service Provider only keeps the access log for a short period of time (usually for three to six months); or, (iii) a tortfeasor can use special anonymization computer programs to prevent the victim from identifying the tortfeasor through the use of the access log.

(m)     Because the access log is deleted by the Online Service Provider after several months, the more recent access log is critical.

(n)     The tortfeasor may be accessing the internet and the Online Service Provider using the anonymization computer program at times, but may have the program off at other times.

(o)     For the foregoing reasons, the more recent access log for a reasonable period of time is necessary because (i) the Online Service Provider may have not recorded a complete access log if discovery is limited to a short period of time, (ii) the older access log has likely been deleted, or (iii) there is a possibility that the tortfeasor may have had his or her anonymization computer program turned off.

(p)     If discovery is allowed only for a short period of time, and for only the older access log, for the foregoing reasons, it will be less likely that the victim will be able to obtain information sufficient to identify the true identity of the tortfeasor.

(q)     Therefore, for the foregoing reasons, it is reasonable to allow discovery of the recent access log, and to not limit discovery to the period at or about the time that the reply comments were published.

31.     In order for the Applicant to identify the Users through the ISP using an IP address, both the IP address and the corresponding timestamp is necessary.

32.     Without the corresponding timestamp, an ISP in the Republic of Korea will be unable to pin-point the tortfeasor that was using the IP address at a certain point-in-time.

*Declaration of Kyongsok Chong*

33.    A timestamp only shows when a person accessed their online account using a specific IP address, and does not disclose what the person was doing using their online account, and therefore, discovery of a timestamp only minimally intrudes upon a person's privacy; the evidentiary value of a timestamp allowing the victim to identify the tortfeasor far outweighs any privacy issues.

34.    Finally, any PII (other than the Recent Access Log) registered, at any time, with the tortfeasor's accounts is necessary, because, based upon my experience as an attorney licensed to practice law in the Republic of Korea, the Users may have not planned to damage the Applicant until a time near to when the reply comments were published, and as such, it is more likely that the Users may have used their true identities near to the time when the reply comments were published.

35.    Recent PII is also relevant and necessary, because the Users may not have changed PII that is not displayed publicly.

36.    The discovery of PII requested is not unduly intrusive, because this information is narrowly tailored to discover the true identities of the Users and is not seeking irrelevant information.

37.    Based upon my experience, where an online account is used for a legitimate purpose, PII is only changed occasionally, and because this information is stored by TikTok and X in the ordinary course of theirs businesses, the burden placed upon TikTok and X in disclosing this information is minimal.

//

//

//

38.    Based upon the foregoing, the information and documents sought from TikTok and X are highly relevant and crucial to the Civil Case in the Republic of Korea and are narrowly tailored and limited to the discovery of information necessary to identify the true identities of the Users against whom the Civil Case was filed.

*Declaration of Kyongsok Chong*

1       I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct.

3       Executed on December ___30___, 2024.

KYONGSOK CHONG

*Declaration of Kyongsok Chong*

BA20241642826

B3038-3329  09/13/2024  9:17 AM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION CORPORATION**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
|---|
| **-FILED-** |
| File No.: BA20241642826 |
| Date Filed: 9/13/2024 |

### Entity Details

| | |
|---|---|
| Corporation Name | X Corp. doing business in California as, X Corp., a Nevada Corporation |
| Entity No. | 5616182 |
| Formed In | NEVADA |

Street Address of Principal Office of Corporation

| | |
|---|---|
| Principal Address | 865 FM 1209, BUILDING 2<br>BASTROP, TX 78602 |

Mailing Address of Corporation

| | |
|---|---|
| Mailing Address | 1355 MARKET ST., SUITE 900<br>SAN FRANCISCO, CA 94103 |
| Attention | |

Street Address of California Office of Corporation

| | |
|---|---|
| Street Address of California Office | None |

### Officers

| Officer Name | Officer Address | Position(s) |
|---|---|---|
| ⊞ Elon Musk | 865 FM 1209, BUILDING 2.<br>BASTROP, TX 78602 | Secretary, Chief Financial Officer |
| ⊞ Linda Yaccarino | 865 FM 1209, BUILDING 2.<br>BASTROP, TX 78602 | Chief Executive Officer |

### Additional Officers

| Officer Name | Officer Address | Position | Stated Position |
|---|---|---|---|
| None Entered | | | |

### Directors

| Director Name | Director Address |
|---|---|
| ⊞ Elon Musk | 865 FM 1209, BUILDING 2<br>BASTROP, TX 78602 |

The number of vacancies on Board of Directors is: 0

Agent for Service of Process

| | |
|---|---|
| California Registered Corporate Agent (1505) | C T CORPORATION SYSTEM<br>Registered Corporate 1505 Agent |

Type of Business

| | |
|---|---|
| Type of Business | Web information services |

Email Notifications

| | |
|---|---|
| Opt-in Email Notifications | No, I do NOT want to receive entity notifications via email. I prefer notifications by USPS mail. |

Labor Judgment

**Exhibit 1**

No Officer or Director of this Corporation has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

Electronic Signature

☒  By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*Elon Musk*                                        *09/13/2024*

Signature                                           Date

B3038-3330  09/13/2024  9:17 AM Received by California Secretary of State

**Exhibit 1**

**Business**

# X officially kills its San Francisco headquarters, will relocate workers to South Bay

The social media giant anchored one of the city's key downtown neighborhoods for more than a decade.



X CEO Linda Yaccarino announced Monday that the company will close its Mid-Market offices "over the next few weeks." | Noah Berger/AP Photo

 Share ➤

By **Kevin V. Nguyen** and **Priya Anand**
Published Aug. 05, 2024 • 4:28pm

It is officially the end of an era for Mid-Market. Thirteen years after the city carved out a special tax break to attract tech companies to its beleaguered downtown corridor, X has confirmed plans to shut its San Francisco headquarters.

In an internal email reviewed by The Standard, CEO Linda Yaccarino announced Monday that X will close the offices "over the next few weeks" and will relocate San Francisco-based employees to the South Bay.

Once the move is complete, X's engineering workers will share an office in Palo Alto with xAI, another company owned by Elon Musk, while the remaining employees will be routed to existing offices in Santana Row, San Jose's popular residential, retail and business thoroughfare. The New York Times first reported the news.

**Exhibit 2**

Yaccarino said in the email titled "SF Office Closure" that the company "is actively working on plans, including transportation options, for those directly impacted" but did not say if X will provide shuttle services or commuter benefits.



X CEO Linda Yaccarino informed San Francisco employees via email that they would be transferred to either Palo Alto or San Jose. | Mark Schiefelbein/AP Photo

"This is an important decision that impacts many of you, but it is the right one for our company in the long term," Yaccarino said.

X did not respond to a request for comment.

When the company was acquired by Musk in late 2022, the mercurial tech mogul immediately called all local employees back into the office full time. Sources inside the company, who do not have permission to speak to the media, confirmed that more than half the space at X's headquarters, located at 1355 Market St., is vacant or unused after multiple rounds of layoffs.

**Exhibit 2**

**Major tech companies that have departed Mid-Market**

| Company | Description |
| --- | --- |
| Zendesk | Leased space at 1019 Market St. in 2013, and ended its contract there in 2021. |
| WeWork | Leased the majority of 995 Market in 2015 before abandoning it in 2021. |
| Block | Opted to go remote-first during the pandemic and in 2022 decided against renewing its lease. |
| Reddit | Leased space at 1455 Market in 2019 before decamping last year. |
| Uber | Open its Mid-Market HQ in 2013, but moved to a new office complex in Mission Bay in 2021. |

TABLE: PRIYA ANAND

S

Last month, the company began <u>marketing the offices for sublease</u>. Shortly thereafter, Musk took to the social media platform to <u>announce</u> that X would relocate to Austin, Texas, due to his fury over a California transgender protection law. Yaccarino's email made no mention of that move.

Altogether, X is on the hook for roughly 800,000 square feet of office space at the near-century-old Art Deco building in Mid-Market, with deals that expire in 2026 and 2028.



After acquiring Twitter in late 2022, Elon Musk initiated mass layoffs while ordering local employees back to the office. Last month, he said the company, now known as X, would move to Austin, Texas. | Chesnot/Getty Images

In 2011, <u>the city said</u> it would pause its 1.5% payroll tax for companies that moved into the area for up to six years. Companies would have to pay only their first year's payroll tax, and if headcount swelled later, the tax amount would stay the same. City officials hoped the policy — and Twitter's arrival — would make the area more attractive to other businesses. And to some extent, it did.

**Exhibit 2**

Certain buildings in the area, such as 1455 Market St., were not eligible for the tax break but still attracted tech companies that opted to cluster around other fast-growing startups. Among the businesses that took the tax break, in addition to Twitter, were the dating app Zoosk, the home decor site One Kings Lane and David Sacks' Yammer.

**Related**



**The Mid-Market faithful: Life inside San Francisco's office dead zone**

Twitter — which at the time was threatening to move to Brisbane — became the face and symbol of this incentive to attract companies and construction to the neighborhood.

A city report assessing the impact of the tax break, published in 2014, three years after it took effect, said it was likely "the primary reason for the relatively greater growth of businesses" in that area. In 2013, 15 businesses benefited from the tax break, saving a collective $4.2 million, according to the report. The report estimated that the city raked in $7.1 million more in payroll tax from the area than it would have otherwise, painting the policy as a victory.

However, since the 2019 expiration of the tax breaks and the wide shift to remote work, that exuberance appears firmly in the rearview mirror.

X's latest announcement is yet another nail in the coffin.

Kevin V. Nguyen can be reached at knguyen@sfstandard.com
Priya Anand can be reached at panand@sfstandard.com

**Filed Under**

Business    Commercial Real Estate    Elon Musk    Mid-Market    Twitter

**Read More**

**Sam Altman is amassing a serious compound in Russian Hill**



# Exhibit 2

Big lease deals show SF companies are committing to the office again



'You could shoot a cannon in there': SF Centre spa owner details why his business died



The NBA (kinda) returns to Roar-acle for one night



How a 113-year-old institution survives the Super Bowl of blossoms



**Popular Today**

**Exhibit 2**

1 'It's insane': Trump moves to abolish Presidio Trust through executive order

2 Here's h

≡Q     The San Francisco Standard     Join Now





**Exhibit 2**

About Us

Staff

Standards & Ethics

Newsletters

RSS Feeds

Jobs

Contact Us

Tips

Advertising Inquiries

Sign In

Membership

Membership FAQs

© The San Francisco Standard. All Rights Reserved.

Terms of Use | Privacy Policy | California Resident Rights | Your Privacy Choices

*Join* **The Standard**

**Exhibit 2**

# Our locations



**TikTok North America**

↺ Check out our other locations



☰  ♪ TikTok          #LifeAtTikTok ⌄   Teams ⌄   How we hire ⌄   Locations   Early Careers   Blog   Jobs

# Explore a location near you

**Africa**

**Asia Pacific**

**Europe**

**Latin America**

**Middle East**

**North America**

**Austin**

**Los Angeles**

**Miami**

**Mountain View**

**New York**

**San Jose**

**Seattle**

**Exhibit 3**



**Toronto**

**Washington D.C.**

**Vancouver**

**♪ TikTok**

**Company**
About TikTok
Newsroom
Contact

**Programs**
TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

**Resources**
Help center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

**Legal**
Privacy Policy
Terms of Service

English ▼

**Exhibit 3**

**TOP STORY**

## Body discovered on board flight to Hawaii

---

**TECHNOLOGY**

# TikTok snags huge Bay Area office in defiance of potential ban, per report

By **Stephen Council**, *Tech Reporter*

March 23, 2024

  

---



The five-story office at 1143 Coleman Ave., San Jose, is going from Roku to TikTok via a sublease, per a new report.

**Exhibit 4**

Courtesy of Google Streetview

TikTok is moving into another huge office in the Bay Area, according to a report from the Mercury News. It's a sign of faith in the future from a company currently facing a potential nationwide ban for its popular short-form video app.

A subsidiary of Chinese tech giant ByteDance, TikTok is subleasing the office at 1143 Coleman Ave. in San Jose from Roku, according to the Mercury News' report, which was based on a filing with the Santa Clara County Clerk-Recorder's Office. It's unclear how long TikTok is signing on to sublease the five-story, 162,000-square-foot office building, but a marketing brochure from real estate firm Colliers says that the lease is due to end in 2029.



 **SFGATE**                    **Newsletters**    __Sign in__

about subleasing some of the tech giant's office space in San Francisco, as well.
(The Chronicle and SFGATE are both owned by Hearst but have separate newsrooms.)

The move would expand TikTok's San Jose footprint. ByteDance subleased more than 650,000 square feet of office space on Coleman Avenue in 2022, and TikTok's job board lists more than 1,000 San Jose postings.

The real estate push is emblematic of TikTok's growth over the past five years in both cultural relevance and consumer count; the company reported 150 million American users in February 2023. The app's success with short videos and a highly personalized algorithm have redefined social media. TikTok videos now often also circulate on Instagram's Reels, Snapchat's Spotlight and YouTube's Shorts products.

But the company faces one significant hurdle to its growth: Washington. Earlier this month, the U.S. House of Representatives passed legislation aimed at forcing

**Exhibit 4**

ByteDance to sell TikTok over fears that the Chinese parent company puts Americans' personal data at risk.

If the company doesn't sell, the bill said, the app wouldn't be allowed in the United States. The House passed the divest-or-ban legislation quickly and overwhelmingly, but the bill will move through the Senate much more slowly, according to the Washington Post. President Joe Biden has said he would sign the bill, should it pass.

In a January hearing, TikTok CEO Shou Zi Chew said the company has never shared data with the Chinese government. According to Reuters, TikTok showed some of its U.S. users a notification on March 15 imploring them to tell their senators to vote against the ban.

Though the threat is existential — the Wall Street Journal reported that China is unlikely to let ByteDance sell TikTok — the social media company's sublease of the San Jose office shows that it is pushing forward with growth. ByteDance investors say TikTok is unprofitable, according to reporting by The Information.

The reported sublease deal is also good news for Roku, which, according to the Colliers brochure, never used the 1143 Coleman Ave. office. The streaming giant said in a filing with the Securities and Exchange Commission in September that office space cuts, while meant to save cash in the long run, would cost the company $160 million to $200 million in the short term.

Roku lists its main headquarters address as 1155 Coleman Ave., San Jose, just next door to the office now reportedly subleased to TikTok. The offices sit beside soccer stadium PayPal Park and San Jose Mineta International Airport.

**Exhibit 4**

TikTok did not respond immediately to SFGATE's questions. Roku declined to comment.

*Hear of anything happening at TikTok, Roku or another tech company? Contact tech reporter Stephen Council securely at stephen.council@sfgate.com or on Signal at 628-204-5452.*

## BEST OF SFGATE

**Local** | She seemed like a kindly landlady. She was really a serial killer
**Drink** | Crowds have flocked to SF's second oldest bar for over 160 years
**Culture** | Inside the most royal home in the history of San Francisco films
**Travel** | An influencer who bought a ghost town is ready to die there

March 23, 2024

  **Stephen Council** 
TECH REPORTER

Stephen Council is the tech reporter at SFGATE. He has covered technology and business for The Information, The Wall Street Journal, CNBC and CalMatters, where his reporting won a San Francisco Press Club award.

**Signal: 628-204-5452**
**Email: stephen.council@sfgate.com**

**Let's Play**

 Typeshift     Really Bad Chess     Flipart     Cross|word

    Top ∧

  

**Exhibit 4**

## About

## Contact

## Services

## Quick Links

HEARST *newspapers*   © 2024 Hearst Communications, Inc.   Terms of Use   |   Privacy Notice   |   CA Notice at Collection   |

Your CA Privacy Rights (Shine the Light)   |   DAA Industry Opt Out   |

Your Privacy Choices (Opt Out of Sale/Targeted Ads)

**Exhibit 4**